**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Graham Webb International Limited,
Partnership,

Plaintiff,

v.

Civil No. 00-2169 RHK/AJB

**MEMORANDUM OPINION AND ORDER**

Michael Gordon, Bumble and Bumble LLC,
Bumble and Bumble Products LLC, and
Estée Lauder Companies, Inc.,

Defendants.

---

Michael A. Stern, Fredrikson and Byron, Minneapolis, Minnesota, for Plaintiff.

John L. Krenn, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minnesota, and Katherine Pringle, Friedman, Kaplan, Seiler & Adelman, New York, New York, for Defendants Michael Gordon, Bumble and Bumble LLC, and Bumble and Bumble Products LLC.

James Bullard and David Jaffe, Leonard, Street and Deinard, Minneapolis, Minnesota, for Defendant Estée Lauder Companies, Inc.

---

## Introduction

This case arises out of the negotiations, and alleged oral contracts, between Plaintiff Graham Webb International Limited Partnership ("Graham Webb") and the owners of Defendants Bumble and Bumble LLC and Bumble and Bumble Products LLC[1],

---

[1] Bumble and Bumble LLC and Bumble and Bumble Products LLC will be referred to collectively as "Bumble and Bumble" or "Bumble and Bumble companies."

FILED JUN 15 2001
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

for the acquisition of the Bumble and Bumble companies by Graham Webb. The acquisition was never completed and the majority of shares in the Bumble and Bumble companies were eventually sold to Defendant Estée Lauder Companies, Inc. ("Estée Lauder").

Graham Webb has brought the following claims against the following Defendants: (I) breach of contract against Michael Gordon ("Gordon"), a part-owner of the Bumble and Bumble companies; (II) breach of confidentiality agreements against Bumble and Bumble and Gordon; (III) interference with contract between Gordon and Graham Webb against Estée Lauder; (IV) interference with contract between Graham Webb and other Bumble and Bumble owners against Gordon and Estée Lauder; (V) acting in concert with Gordon against Estée Lauder; (VI) interference with prospective economic advantage against Estée Lauder and Gordon; (VII) misappropriation of trade secrets against Estée Lauder; (VIII) breach of duty of confidentiality against Estée Lauder; (IX) unfair competition against Estée Lauder; (X) promissory estoppel against Gordon; and (XI) breach of covenant of good faith and fair dealing against Gordon.

Before the Court are the Defendants' Motions to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] For the reasons set forth below, the Court will grant in part the motions.

---

[2] Defendants Michael Gordon and Bumble and Bumble brought a combined Motion to Dismiss, and Defendant Estée Lauder brought its own Motion to Dismiss.

## Background

### I. Parties

Plaintiff Graham Webb is a Minnesota partnership, with its principal place of business in Carlsbad, California. (Am. Compl. ¶ 8.) Graham Webb is in the hair care business and sells hair care products both nationally and internationally. (Id.) Defendant Bumble and Bumble LLC is a New York company that owns and operates a hair salon in New York City. (Id. at ¶ 9.) Defendant Bumble and Bumble Products LLC is also a New York company and is involved in the national and international hair care products business. (Id.) Defendant Gordon is a resident of New York and is the President and part-owner of the Bumble and Bumble companies. (Id. at ¶ 10.) Defendant Estée Lauder is a Delaware corporation with its principal place of business in New York. (Id. at ¶ 11.) Estée Lauder manufactures and sells, inter alia, hair care products both nationally and internationally. (Id. at ¶ 11.)

### II. Factual Background

The following factual background is taken from Graham Webb's Amended Complaint. See Cooper v. Pate, 378 U.S. 546, 546 (1964) (per curiam) (stating that on a Rule 12(b)(6) motion, the Court must accept as true the allegations of the complaint).

In May 1999, Rick Kornbluth ("Kornbluth"), Graham Webb's President, met with Defendant Gordon and another part-owner of Bumble and Bumble, Moss Kadey

("Kadey"), to have initial discussions regarding the possible acquisition of Bumble and Bumble by Graham Webb. (Am. Compl. at ¶ 14.) Kornbluth and Gordon met again on July 16, 1999. The July meeting also included Bumble and Bumble's Chairman of the Board and Chief Executive Officer, Robert Taylor ("Taylor"). (Id. at ¶ 15.) At this meeting, the parties agreed to exchange information about their respective companies and to have additional discussions regarding the possible acquisition of Bumble and Bumble by Graham Webb. (Id.)

In furtherance of the above agreements to exchange information, Graham Webb, Kadey, and Gordon entered into three confidentiality agreements. On July 27, 1999, (hereinafter "the July 27th agreement") Kadey entered into a confidentiality agreement with Graham Webb providing that Kadey and his representatives would not disclose to any person that discussions were taking place regarding the possible acquisition of Bumble and Bumble. (Id.) On July 30, 1999, (hereinafter "the July 30th agreement") Kornbluth signed a similar confidentiality agreement on behalf of Graham Webb. (Id. at ¶ 17.) On November 8, 1999, (hereinafter "the November 8th agreement") Gordon signed a confidentiality agreement promising that he would not disclose information regarding the possible acquisition of Bumble and Bumble by Graham Webb. (Id. at ¶ 18.) The three confidentiality agreements provided that they would be governed by and construed in accordance with the laws of the State of Minnesota and would be applicable to

agreements made and to be performed entirely within Minnesota. (Id. at ¶¶ 16, 17, and 18.)

Negotiations regarding Graham Webb's possible acquisition of Bumble and Bumble continued from August 1999 through mid-November 1999. (Id. at ¶ 20.) During this time, Bumble and Bumble and Graham Webb exchanged detailed information about their companies, which included financial data, purchase price valuations, and compensation packages. (Id.) In October 1999, Graham Webb retained an investment banking firm, Donaldson, Lufkin & Jenrette "DLJ"), to initiate a private placement[3] of Graham Webb's equity, most of which would be used to finance the acquisition of Bumble and Bumble. (Id. at ¶ 21.)

***A. The November 17 Contract***

On November 17, 1999, Kornbluth, representatives from DLJ, and all the equity owners of Bumble and Bumble -- Kadey, Gordon, Tevya Finger, Jonathan Sharp, and Daniel Kaner -- met in New York to discuss the possible acquisition of Bumble and Bumble by Graham Webb. (Id. at ¶ 22.) At this meeting, the parties agreed orally to "definite, specific and detailed contracts . . . between [Graham Webb] and Kadey, Gordon, Finger, Sharp[,] and Kaner . . . ." (Id.) The details of the November 17 contract

---

[3] A "private placement," in the securities context, is the sale of stock or bonds issued directly to private persons or institutional investors without a public offering. Black's Law Dictionary 1196 (6th ed. 1990).

were as follows: Graham Webb was to purchase all of Kadey's and Sharp's equity in Bumble and Bumble, twelve and a half percent of Gordon's equity–leaving him a thirty percent owner–and one percent of Kaner's equity–leaving him a four percent owner.[4] (Id.) These oral contracts also provided that Gordon, Tevya Finger, and Daniel Kaner would continue to work for Bumble and Bumble after the acquisition, and would negotiate in good faith the details of their continued employment contracts. (Id.) After the November meeting, the lawyers for Graham Webb began preparing detailed transaction documents memorializing the contracts entered into at the meeting. (Id.)

### *B. The Private Placement Memorandum*

In December 1999, DLJ, in consultation with Gordon and Bumble and Bumble, prepared a Private Placement Memorandum ("PPM") for the purpose of soliciting investors. The PPM contained confidential information regarding the possible acquisition of Bumble and Bumble by Graham Webb. (Id. at ¶ 24.) Graham Webb and Gordon agreed to put the following statement in the PPM: "In December 1999, the Company [Graham Webb] agreed to acquire 61% of Bumble and Bumble, an ultra high-end hair care product and salon company, for approximately $22.3 million dollars [sic]." (Id.) The PPM was labeled "confidential" on its cover and contained a statement that any

---

[4] Tevya Finger owned five percent of Bumble and Bumble and was to retain his full five percent pursuant to the contract. (Id. at ¶ 22.)

person who received the PPM was to hold it in the strictest of confidence and not use the PPM to Graham Webb's detriment. (Id. at ¶ 25.)

In December 1999, a DLJ representative spoke with an executive at Estée Lauder to determine whether Estée Lauder would be interested in receiving the PPM. (Id. at ¶ 26.) The DLJ representative stated that the PPM was a confidential memorandum regarding the acquisition of Bumble and Bumble. (Id.) The Estée Lauder executive responded that he was interested in the PPM and requested that DLJ send him a copy. (Id.) DLJ sent a copy of the PPM, together with a confidentiality agreement, to Estée Lauder, both of which were returned within a few days unsigned. (Id. at ¶ 28.) Estée Lauder later informed DLJ that it was not interested in making new investments in the hair care products business. (Id.) On December 22, 1999, Taylor wrote to the Chairman of the Board of Estée Lauder, Leonard Lauder, and enclosed another copy of the PPM. (Id. at ¶ 29.) The PPM was again marked confidential, but did not include a confidentiality agreement. (Id.) Leonard Lauder did not respond to Taylor's letter and did not return any of Taylor's follow-up telephone calls. (Id. at ¶ 30.)

### *C. The Acquisition is Abandoned*

During late 1999 and early 2000, Gordon indicated that he was reconsidering the deal with Graham Webb and began making unreasonable demands with respect to his proposed continued employment agreement. (Id. at ¶ 31.) Gordon also informed Graham

Webb during this time that he had received inquiries from other potential purchasers for Bumble and Bumble. (Id. at ¶ 32.)

On January 17, 2000, Estée Lauder's Executive Director of Corporate Development, Pauline Garris, wrote Taylor stating, "[a]s you and I discussed the other day, and as previously advised DLJ, we are not interested in pursuing this placement." (Id. at ¶ 33.) In late January 2000, Gordon informed Graham Webb that he did not intend to sell his interest in Bumble and Bumble to, or negotiate a continued employment agreement with, Graham Webb. (Id. at ¶ 34.) As a result of Gordon's decision not to sell his interest to Graham Webb, the contracts with the other selling owners of Bumble and Bumble fell through, which resulted in Graham Webb's eventual abandonment of the acquisition. (Id. at 35.)

On June 2, 2000, Estée Lauder issued a press release announcing that it had signed an agreement to acquire a majority interest in Bumble and Bumble. (Id. at ¶ 38.) The press release also stated that Gordon, Tevya Finger, and Daniel Kaner would remain as equity holders in Bumble and Bumble. (Id.) This suit followed.

## Analysis

### I. Standard of Decision

In considering a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must take as

true the allegations contained in the complaint. See Cooper v. Pate, 378 U.S. 546 (1964) (per curiam). A complaint

> must be viewed in the light most favorable to the plaintiff and should not be dismissed merely because the court doubts that a plaintiff will be able to prove all of the necessary factual allegations. "Thus, as a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."

Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982) (quoting Jackson Sawmill Co. v. United States, 580 F.2d 302, 306 (8th Cir. 1978)). Viewing the complaint in this manner, the court may dismiss a case under Rule 12(b)(6) only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. See Hishon v. King & Spalding, 467 U.S. 69, 73 (1984) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

## II. Documents to be Considered for Motions to Dismiss

Attached to the Defendants' Motions to Dismiss are copies of three confidentiality agreements[5] and six "letters of intent" between Graham Webb and certain owners of Bumble and Bumble. (Jaffe Aff. Exs. A-J; Hartch Aff. A and B; Krenn Aff. Ex. A.) Also attached are two articles regarding Graham Webb's possible acquisition of Bumble and

---

[5] Plaintiff has termed these letters "confidentiality agreements." Defendants, on the other hand, argue that they are much more than confidentiality agreements, as they contain the "rules" for the future negotiations between the parties. The Court agrees. For purposes of this motion, however, the Court will refer to them as confidentiality agreements.

Bumble, (Jaffe Aff. Exs. J and K (Jan. 14, 2000, article in HBA Report; Jan. 15, 2000, article in New York Post)), and a letter from Taylor to Leonard Lauder dated December 22, 1999. (Id. Ex. L.) Defendants argue that the above documents should be considered by the Court because they are "necessarily embraced" by Graham Webb's Complaint and Amended Complaint.

A court deciding a motion to dismiss for failure to state a claim may not consider extraneous materials beyond the complaint itself unless the materials are "necessarily embraced" by the pleadings. See Parnes v. Gateway 2000, Inc., 122 F.3d 539, 546 n.9 (8th Cir. 1997); Piper Jaffray v. Nat. Union Fire Ins. Co., 967 F. Supp. 1148, 1152 (D. Minn. 1997) (Tunheim, J.); Vizenor v. Babbitt, 927 F. Supp. 1193, 1198 (D. Minn. 1996) (Kyle, J.). "A district court may consider documents on a motion to dismiss where . . . plaintiffs' claims are based solely on the interpretation of the documents and the parties do not dispute the actual contents of the documents." Jenisio v. Ozark Airlines Inc. Ret. Plan for Agent & Clerical Employees, 187 F.3d 970, 972 n.3 (8th Cir. 1999) (emphasis added) (citing Silver v. H & R Block, Inc., 105 F.3d 394, 397 (8th Cir. 1997)). If the court considers materials in a motion to dismiss that are not embraced by the pleadings, then "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all

material made pertinent to such a motion by Rule 56."[6] Fed. R. Civ. P. 12(b).

The Defendants argue that the Court may consider all of the documents that are referenced in either Graham Webb's Complaint or Amended Complaint. The law does not support this assertion, however. "It is well-established that an amended complaint supercedes an original complaint and renders the original complaint without legal effect." In re Atlas Van Lines, Inc., 209 F.3d 1064, 1067 (8th Cir. 2000) (quoting Washer v. Bullitt County, 110 U.S. 558, 562 (1884)). Therefore, in determining whether a document is necessarily embraced by the complaint, the Court does not review Graham Webb's original Complaint, but considers only its Amended Complaint.

The Court will consider the three confidentiality agreements in deciding the instant motions. (See Jaffe Aff. Exs. A, B, and C.) Graham Webb's claims for breach of confidentiality by Defendants Gordon and Bumble and Bumble are based solely on these agreements. Therefore, the confidentiality agreements are "necessarily embraced" by the Amended Complaint, and will be considered by the Court, without converting the motions to ones for summary judgment.

---

[6] The Court will not convert these motions to ones for summary judgment. Converting these motions would, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, require giving all parties a reasonable opportunity to present material pertinent to a motion for summary judgment. Because there has been no discovery in this case, and Graham Webb has not had the opportunity to gather pertinent materials, the Court concludes that summary judgment at this early stage would be premature. See Grillo v. John Alden Life Ins. Co., 939 F. Supp. 685, 686 (D. Minn. 1996) (Davis, J.).

In addition to the three confidentiality agreements, the Court will consider the December 22, 1999, letter from Taylor to Leonard Lauder ("Lauder"). In its Amended Complaint, Graham Webb contends that when it sent the PPM to Estée Lauder it did so with the intent to keep the substance of the PPM confidential.[7] The letter to Lauder was attached to the PPM and was specifically referenced in Graham Webb's Amended Complaint; therefore, it is necessarily embraced by the pleadings.

The remaining documents, however, are not embraced by the pleadings, and will not be considered by the Court in ruling on the instant motions. The newspaper articles from January 14, 2000, and January 15, 2000, are not mentioned in the Amended Complaint, nor has Graham Webb stated a claim based on these articles. See Jenisio, 187 F.3d at 972 n.3. The Court will likewise not consider the letters of intent between the Bumble and Bumble owners and Graham Webb because they are not embraced by the Amended Complaint. Furthermore, the letters of intent, as Estée Lauder points out, "are part of an alleged course of negotiations . . . ." (Estée Lauder's Reply Mem. in Supp. of Mot. to Dismiss at 4 ("Estée Lauder's Reply").) While the bargaining history between the parties is relevant to a motion for summary judgment, in a motion to dismiss the Court determines only whether Graham Webb has stated a claim upon which relief can be granted, and it does not look past the Amended Complaint in making this determination.

---

[7] The PPM was not submitted to the Court with the Motions to Dismiss.

Accordingly, the Court will only consider the confidentiality agreements and the letter from Taylor to Lauder in ruling on the Defendants' Motions to Dismiss.[8]

## III. Choice of Law

The parties dispute which state's law should be applied in this case. Graham Webb contends that New York law should be applied to all of its claims except its claim for breach of the confidentiality agreements against Gordon and Bumble and Bumble; for this claim, Graham Webb contends Minnesota law should apply. These confidentiality agreements contain a clause which provides that the agreements "shall be governed by and construed in accordance with the laws of the State of Minnesota." (Jaffe Aff. Exs. A, B, and C.) The Defendants argue that Minnesota law should be applied to all of Graham Webb's claims, and that Plaintiff should not be allowed to apply one state's law when it is favorable to it and another's law when it is not.

Federal courts sitting in diversity apply the choice of law rules of the forum state. See Nesladek v. Ford Motor Co., 46 F.3d 734, 736 (8th Cir. 1995) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)). This Court, therefore, applies Minnesota choice of law rules. In analyzing a choice of law issue under Minnesota law, the first

---

[8] Also included with the Defendants' motions was an unsigned letter from Kornbluth to Taylor, an unsigned purchase agreement between Graham Webb, Bumble and Bumble, and Gordon, and an unsigned employment agreement between Gordon and Bumble and Bumble. (Gordon Aff. Exs. B, D, and E.) These documents will not be considered by the Court as they are not embraced by Graham Webb's Amended Complaint and represent only the negotiation history of the parties.

consideration is whether the choice of one state's law over another's creates an actual conflict. See Jepson v. General Cas. Co., 513 N.W.2d 467, 469 (Minn. 1994) (en banc); see also Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1393 (8th Cir. 1997) (applying Minnesota law).

### *A. Actual Conflict of Law*

Defendants assert that there is no actual conflict between New York law and Minnesota law; therefore, Minnesota law should be applied. Graham Webb contends that at least with respect to the breach of contract claim in Count I of the Amended Complaint there is a conflict, namely that "New York law recognizes the validity and enforceability of so-called 'agreements to negotiate in good faith' while Minnesota courts often do not." (Pl.'s Mem. in Opp'n to Def.'s Rule 12(b)(6) Mot. to Dismiss at 12-13 ("Pl.'s Opp'n Mem.").) Although not specifically stated by Graham Webb, this conflict relates to whether Gordon's November 17, 1999, agreement to negotiate his continued employment contract in good faith is enforceable. Graham Webb does not assert that there are any further conflicts between Minnesota and New York law.

The Court agrees with Graham Webb that there is an actual conflict between New York and Minnesota law relating to the enforceability of agreements to negotiate in good faith. Minnesota does not recognize the validity of these agreements. See C & S Acquisitions Corp. v. Northwest Aircraft, Inc., 153 F.3d 622, 626 (8th Cir. 1998) ("Under

Minnesota law, agreements to negotiate in good faith in the future are unenforceable as a matter of law."); see also Mohrenweiser v. Blomer, 573 N.W.2d 704, 706 (Minn. Ct. App. 1998) ("In Minnesota, . . . an agreement to negotiate in good faith in the future is not enforceable because it does not constitute the parties' complete and final agreement."); Consol. Grain & Barge Co. v. Madgett, 928 F.2d 816, 817-18 (8th Cir. 1991) (finding that under Minnesota law, "an agreement to negotiate is unenforceable" because such agreements generally do not provide a basis for determining whether a breach has occurred or for providing an appropriate remedy for a breach). New York, conversely, recognizes what it has termed "binding preliminary commitments." Shann v. Dunk, 84 F.3d 73, 77 (2d Cir. 1996). A binding preliminary commitment exists "where the parties recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open." Id. (citing Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989); Teachers Ins. & Annuity Ass'n v. Tribune Co., 670 F. Supp. 491, 497-99 (S.D.N.Y. 1987).

Bumble and Bumble and Gordon disagree with Graham Webb's reading of New York law. They assert that an agreement to agree, in which a material term is left out, is not enforceable under either Minnesota or New York law. (Def's Bumble and Bumble and Gordon's Reply Mem. in Supp. of Mot. to Dismiss at 6 ("Bumble and Bumble and

Gordon's Reply").) Therefore, neither Minnesota nor New York law would recognize or enforce mere agreements to agree. Defendants rely upon, inter alia, 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp., 575 N.E.2d 104, 105 (N.Y. 1991), and Adjustrite Sys. v. Gab Bus. Serv., 145 F.3d 543, 548 (2d Cir. 1998), for this proposition. (See Bumble and Bumble and Gordon's Reply at 6; Def. Estée Lauder's Mem. in Supp. of Mot. to Dismiss at 13 n.7 ("Estée Lauder Supp. Mem.").) The Court finds these cases to be inapposite. The Mamaroneck case did not involve an agreement to negotiate the terms of a contract in good faith–the issue in that case was whether the contract was sufficiently definite to be enforceable. Mamaroneck, 575 N.E.2d at 105. The Mamaroneck court held that the fact the contract did not specify the precise manner in which the amount of rent is to be calculated did not render the contract unenforceable. The court only addressed agreements to agree in dicta, citing Martin Delicatessen v. Schumacher, 52 N.Y.2d 105, 109 (N.Y. 1981), which held that a mere agreement to agree is unenforceable. Neither Mamaroneck nor Schumacher, however, discussed the exception to New York law's general prohibition against agreements to agree. This exception was discussed in the Adjustrite case cited by the Defendants. The Defendants quote the following language in Adjustrite: "Ordinarily, where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." (Estée Lauder Supp. Mem. at 13 n.7.) Defendants fail,

however, to quote the language directly following, which recognizes binding preliminary agreements:

> In some circumstances, however, preliminary agreements can create binding obligations. Usually, binding preliminary agreements fall into one of two categories. The first is a fully binding preliminary agreement, . . . . The second type of preliminary agreement, dubbed a "binding preliminary commitment" by Judge Leval, is binding only to a certain degree. It is created when the parties agree on certain major terms, but leave other terms open for further negotiation. The parties "accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement."

Id. (quoting Tribune, 670 F. Supp. at 498; and citing Arcadian, 884 F.2d at 72-73) (emphasis added).

Accordingly, under Minnesota law, Gordon's oral commitment to negotiate his continued employment agreement with Bumble and Bumble in good faith, could be invalid as a mere agreement to agree.[9] Under New York law, however, such an agreement may be enforceable, thus creating an actual conflict between Minnesota and New York law.

In addition to the above arguments by the parties, the Court notes that there is at

---

[9] As Graham Webb points out, however, Minnesota courts will enforce a contract that has missing terms, so long as those terms are not fundamental to the contract. See Hill v. Okay Constr. Co. Inc., 252 N.W.2d 107, 114 (Minn. 1977) ("In order for a contract to be specifically enforced, it is not necessary that the parties agree on every possible point, but rather, the law requires merely that the parties' intent as to the fundamental terms of the contract can be ascertained with reasonable certainty." (citations omitted)). Accordingly, whether Gordon's agreement to negotiate in good faith is enforceable under Minnesota law will depend on whether his continued employment agreement is a fundamental term of the November 17 contract.

least one other significant difference between New York and Minnesota law, which would also create an actual conflict. New York does not allow parties to a written agreement, which purports to prohibit modifications except by an express method, to modify the agreement orally.[10] See Chem. Bank v. Wasserman, 37 N.Y.2d 249, 251 (1975). Minnesota, along with the majority of states, allows such oral modifications. See Goshey v. ITT Life Ins. Corp., 590 F.2d 737, 740 (8th Cir. 1979) (applying Minnesota law). Therefore, depending on which law the Court finds applicable to this case, the November 17, 1999, oral agreement that Plaintiff relies on in its Amended Complaint may or may not be enforceable.[11]

### *B. Constitutionality of Applying Either Forum's Law*

Upon finding that an actual conflict exists between New York and Minnesota contract law, the Court must determine whether both state's laws can constitutionally be applied to this case. See Jepson, 513 N.W.2d at 469. "[F]or a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant

---

[10] Texas and California likewise do not recognize subsequent oral modifications when the parties have agreed to allow only written modifications of an existing contract. See Kayne v. First Charter Bank, 16 Cal. Rptr. 2d 450 (Cal. Ct. App. 1993); Givens v. Dougherty, 671 S.W.2d 877 (Tex. 1984).

[11] As will be discussed below, the parties entered into various confidentiality agreements which limited the rights of the parties to bring claims based on the negotiations for the acquisition of Bumble and Bumble. The agreements provided that they could only be modified in writing. (Jaffe Aff. Exs. A, B, and C (confidentiality agreements).)

contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." Allstate Ins. Co. v. Hague, 449 U.S. 302, 312-13 (1981). Both Minnesota and New York have significant contacts with this case. Graham Webb is a Minnesota partnership, Bumble and Bumble is a New York company, Gordon is a resident of New York, Estée Lauder has its principal place of business in New York, and the parties chose Minnesota law to govern the confidentiality agreements. Therefore, either state's law may constitutionally be applied.

***C. Five-Factor Test for Choice of Law Analysis***

Having concluded that a conflict of law exists between New York and Minnesota, and that either state's law may constitutionally be applied, the Court then applies the five-factor test used by Minnesota courts to resolve choice of law questions: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. See Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co., 604 N.W.2d 91, 94 (Minn 2000).

i. Predictability of Results

This factor "represents the ideal that litigation on the same facts, regardless of where the litigation occurs, should be decided the same to avoid forum shopping." Id. (citations omitted). "[O]bligations incurred by residents of one state, in that state, to be

performed in that state, were governed by the laws of that state." Gate City Fed. Sav. & Loan Ass'n v. O'Connor, 410 N.W.2d 448, 450-51 (Minn. Ct. App. 1987). The fact that the November 17, 1999, contract was entered into in New York, between a New York resident and a Minnesota resident, and the acquisition was of a New York company, favors the application of New York law.

ii. Maintenance of Interstate Order

"[M]aintenance of interstate order [] is primarily concerned with whether the application of [Minnesota] law would manifest disrespect for [New York's] sovereignty [or vice versa] or impede the interstate movement of people or goods." Nodak, 604 N.W.2d at 94. "An aspect of this concern is to maintain a coherent legal system in which the courts of different states strive to sustain, rather than subvert, each other's interests in areas where their own interests are less strong." Id. Because there is no evidence that either state has a stronger interest in this case, or that application of either state's law would impede the interstate movement of people or goods, this factor does not favor applying either state's law.

iii. Simplification of the Judicial Task

Under Minnesota law, simplification of the judicial task ordinarily poses no problem since the courts are fully capable of administering the law of another forum if called to do so. See id. (citations omitted). "However, 'this factor is obviously advanced

when a Minnesota court applies Minnesota law.'" H. Enters. Int'l, Inc. v. Gen. Elec. Capital Corp., 833 F. Supp. 1405, 1417 (D. Minn. 1993) (Doty, J.) (quoting Gimmestad v. Gimmestad, 451 N.W.2d 662, 666 (Minn. Ct. App. 1990)). Accordingly, the simplification of the judicial task favors applying Minnesota law.

iv. Advancement of the Forum's Governmental Interests

"This factor is concerned with which choice of law most advances a significant interest of the forum." Nodak, 604 N.W.2d at 94. This factor does not weigh in favor of either Minnesota or New York. Both states have an interest in protecting the contract rights of its citizens.

v. The Better Rule of Law

The application of the better rule of law factor has not had any emphasis placed on it by the Minnesota Supreme Court in twenty years, and has, for the most part, been ignored by the courts. See Nodak, 604 N.W.2d at 96-97. As discussed above, however, Minnesota law, which permits the oral modification of a written agreement even if the agreement prohibits oral modifications, is consistent with the law of the vast majority of other states; New York law on this issue is consistent with only California and Texas. Accordingly, the better rule of law factor weighs in favor of applying Minnesota law.[12]

---

[12] In addition, the fact that the parties have previously agreed that, for at least some of the claims, Minnesota law should apply weighs in favor of applying Minnesota law to those claims. See Hagstrom v. Am. Circ. Breaker Corp., 518 N.W.2d 46, 48 (Minn. Ct. App. 1994) (stating that Minnesota generally recognizes and enforces choice

Based on the these factors, the Court concludes that Minnesota law should be applied to all of Graham Webb's claims.[13]

## IV. Merits

### A. Breach of Contract by Gordon (Count I)

Graham Webb claims that Gordon breached his November 17, 1999, oral contract to (1) sell twelve and a half percent of his stock to Graham Webb, (2) continue working for Bumble and Bumble after the acquisition, and (3) negotiate in good faith the details of his continued employment. Defendants argue that in accordance with the July 30th confidentiality agreement between Rick Kornbluth, as President and Chief Operating Officer of Graham Webb,[14] and Bumble and Bumble, there could be no final agreement involving Bumble and Bumble unless it was "executed and delivered." (Jaffe. Aff. Ex. B.) Defendants also argue that, in the July 30 agreement, Graham Webb expressly waived its right to bring this suit.

Defendants' argument that the parties could not have entered into a legally

---

of law clauses in contracts).

[13] This analysis is appropriate for the instant motion. When all evidence is before the Court, however, the choice of law analysis may favor the application of another state's law. See Conrod v. Davis, 120 F.3d 92, 94 (8th Cir. 1997) (law of the case doctrine does not deprive the district court of the ability to reconsider earlier rulings)).

[14] Graham Webb does not contend that Kornbluth's signature on the confidentiality agreement as "Rick Kornbluth, President and COO" did not bind Graham Webb. (Jaffe Aff. Ex. B.)

enforceable oral agreement on November 17, 1999, is based on the following language from the July 30th agreement: "You [Graham Webb] understand and agree that no contract or agreement providing for any Possible Transaction[15] shall be deemed to exist between you and the Company [Bumble and Bumble] unless and until a final definitive agreement has been executed and delivered . . . ." (Jaffe Aff. Ex. B (the July 30th agreement) (emphasis added).) The term "executed and delivered" indicates that there could not be a final agreement involving Bumble and Bumble unless it was in writing, as an oral contract cannot be executed and delivered. Accordingly, the November 17th agreement would prohibit Graham Webb from claiming an oral agreement exists between itself and Bumble and Bumble.

Defendants assert that the July 30th agreement was between Graham Webb and the individual owners of Bumble and Bumble, specifically Gordon as part-owner, and that Graham Webb's Amended Complaint is a "blatant violation" of the requirement that any final agreement be executed and delivered. (Bumble and Bumble and Gordon Supp. Mem. at 6.) The Court disagrees that the July 30th agreement applies to the individual owners of Bumble and Bumble. The "Company" is defined in the July 30th agreement as "Bumble and Bumble and/or its subsidiaries, affiliates or divisions." (Jaffe Aff. Exs. A, B, and C.) Gordon, however, is not a subsidiary, affiliate, or division of Bumble and

---

[15] "Possible Transaction" is defined by the confidentiality agreements as simply "a possible negotiated transaction." (Jaffe Aff. Exs. B and C.)

Bumble. Although Gordon was the President and part-owner of Bumble and Bumble on July 30th, there is no indication in the July 30th agreement that the definition of the "Company" included its officers, directors, and shareholders. Graham Webb's oral contract with Gordon was for the sale of Gordon's shares in Bumble and Bumble; Gordon was not acting on behalf of Bumble and Bumble when he entered into an agreement to sell a certain percentage of his ownership in the company.

In addition to the above language, the July 30th agreement also states: "You further understand that . . . (iii) you [Graham Webb] shall not have any claims whatsoever against the Company [Bumble and Bumble], its Representatives or any of their respective directors, officers, stockholders, owners, affiliates or agents arising out of or relating to any transaction involving the Company [Bumble and Bumble] (other than those as <u>against the parties to a definitive agreement with you</u> in accordance with the terms thereof) . . . ." (Jaffe Aff. Ex. B (emphasis added).) Because Graham Webb alleges that there was a definitive agreement between itself and Gordon, a stockholder and an officer of Bumble and Bumble, the above waiver would not bar this suit. The Court concludes, therefore, that the July 30th agreement does not prohibit Graham Webb from entering into an oral agreement with Gordon or the other selling owners of Bumble and Bumble for the purchase of their shares in Bumble and Bumble. Accordingly, this agreement does not present an insuperable bar to relief.

Although Defendants rely primarily on the July 30th agreement for its argument against Graham Webb's enforcing the oral contract, it also cites to the November 8th agreement signed by Gordon. (Jaffe Aff. Ex. C.) This agreement contains the same language: "You [Gordon] understand and agree that no contract or agreement providing for any Possible Transaction shall be deemed to exist between you and the Company [Graham Webb] unless and until a final definitive agreement has been executed and delivered . . . ." (Id.) Defendants, however, do not address the issue of whether the November 8th agreement also binds Graham Webb to the understanding that no contract will exist unless executed and delivered. The plain language of the agreement suggests that only Gordon was bound to this agreement, and for purposes of these motions, the Court views the language in the light most favorable to Graham Webb. Accordingly, the Court finds that the language of the November 8th agreement does not present an insuperable bar to relief.

Graham Webb also argues that even if either of these confidentiality agreements were applicable to an oral contract between Gordon and Graham Webb, such that Graham Webb agreed that any final agreement would have to be executed and delivered, the rule in Minnesota is that parties can orally modify a contract that requires only written modifications. "The general common law rule [in Minnesota] is that a written contract can be varied or rescinded by oral agreement of the parties, even if the contract provides

that it shall not be orally varied or rescinded." See Larson v. Hill's Heating & Refrigeration of Bemidji, 400 N.W.2d 777, 781 (Minn. Ct. App. 1987) (citing 6 Corbin on Contracts § 1295, at 206 (1962)). Thus, the requirement that a final agreement be executed and delivered could be waived orally by the parties, despite the language in the confidentiality agreements stating: "Neither this paragraph nor any other provision in this agreement can be waived or amended except by written consent of the Company, which consent shall specifically refer to this paragraph (or such provision) and explicitly make such waiver or amendment." (Jaffe Aff. Exs. A, B, and C.) See Goshey, 590 F.2d at 740 (applying Minnesota law, the court stated "[o]rdinarily, under contract law, a provision purporting to prohibit modification of a contract except by a specified method does not prevent the parties to a contract from modifying it by some other methods.").

Defendants counter that if there was such an agreement by the parties to orally waive the requirement that the final agreement be executed and delivered, Graham Webb has failed to plead this in its Amended Complaint. Defendants do not assert, however, how the failure to plead this creates an insuperable bar to relief. There is then a set of facts–that the parties orally agreed to modify the requirement that a final agreement be executed and delivered–that, if proved, may entitle Graham Webb to relief. Accordingly,

the Court concludes that neither the July 30th agreement nor the November 8th agreement present an insuperable bar to relief.[16]

### B. Breach of Confidentiality Agreement (Count II)

Graham Webb contends that Bumble and Bumble and Gordon breached their respective confidentiality agreements by disclosing the fact that discussions were taking place concerning the possible acquisition of Bumble and Bumble by Graham Webb. (Am. Compl. ¶ 45.) The Defendants counter that Graham Webb (1) fails to identify any information that was allegedly communicated by Defendants in violation of the confidentiality agreement, (2) fails to allege the materiality or causation elements of breach of a confidentiality agreement, and (3) fails to allege the existence of a confidentiality agreement between itself and Bumble and Bumble. (Bumble and Bumble and Gordon's Reply at 15.)

Defendants' assertion that Graham Webb's claim should be dismissed because it failed to allege the materiality or causation elements of breach of confidentiality agreement is without merit. Graham Webb alleged in its Amended Complaint that as a

---

[16] The Court, however, has doubts regarding the enforceability of Gordon's agreement to continue working after Graham Webb's acquisition of Bumble and Bumble. Agreements to agree, under Minnesota law, are not enforceable, and, depending on whether Gordon's agreement to negotiate in good faith is a material term of his oral contract to continue working post-acquisition, the entire oral contract may be unenforceable.

"direct and proximate result" of Defendants' conduct it sustained damages. (Am. Compl. ¶ 46.)

Graham Webb's failure to identify any information that was allegedly communicated by Defendants in violation of the confidentiality agreement, is not fatal to its claim at this stage. Graham Webb alleges that Bumble and Bumble and Gordon disclosed that discussions or negotiations were taking place between Graham Webb and the Bumble and Bumble owners. (Am. Compl. ¶ 45.) Graham Webb's allegations that, within a few months of Graham Webb's entering into an oral contract with Gordon, Estée Lauder entered into a similar contract, is sufficiently definite to put Gordon and Bumble and Bumble on notice that Graham Webb is asserting that the details of its oral contract with Gordon were communicated to Estée Lauder.

Defendants also assert that Graham Webb's claim against Bumble and Bumble must fail because Graham Webb cannot point to a confidentiality agreement between itself and Bumble and Bumble. Graham Webb responds that the July 27th agreement signed by Kadey, Bumble and Bumble's Chairman of the Board, is binding on Bumble and Bumble. (Am. Compl. ¶ 16; Graham Webb's Opp'n Mem. at 26.) Whether Kadey signed the July 27th agreement on Bumble and Bumble's behalf or on his own behalf is a fact question; it is sufficient for purposes of these motions that Graham Webb alleges the July 27th agreement was signed by Kadey as Chairman of the Board of Bumble and

Bumble, and on Bumble and Bumble's behalf.[17] Accordingly, the Court concludes that with respect to this claim Defendants have not shown an insuperable bar to relief.

Although Graham Webb's Amended Complaint does lack allegations of "what defendants allegedly disclosed, when they disclosed it, or to whom they disclosed it," the purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to determine whether the plaintiff has met the formal requirements of its claim; the purpose is not to resolve the merits of the case. (See Bumble and Bumble and Gordon's Supp. Mem. at 10;) see also Peck v. Hoff, 660 F.2d 371, 374 (8th Cir. 1981). The proper remedy, assuming Defendants are not able to discern the nature of Graham Webb's claim, is a motion for a more definite statement under Rule 12(e). Fed. R. Civ. P. 12(e).

### C. Tortious Interference with Contracts (Counts III and IV)

Graham Webb's first claim for tortious interference with contract is against Estée Lauder. Graham Webb contends that Estée Lauder tortiously interfered with its contract with Gordon. (Am. Compl. ¶ 48.) Graham Webb's second claim for tortious interference with contract is against both Estée Lauder and Gordon. Graham Webb alleges that Estée Lauder and Gordon tortiously interfered with its contract with the other selling owners of

---

[17] The July 27th agreement is addressed to Moss Kadey, Bumble and Bumble. (Jaffe Aff. Ex. A.) It contains language that implies the signatory to the agreement is a corporation, i.e., the agreement ends with the statement: "Please confirm your agreement with the foregoing by having a duly authorized officer of your organization sign and return one company of this letter to the undersigned . . . ." (Jaffe Aff. Ex. A.)

Bumble and Bumble. (Am. Compl. ¶ 52.) Defendants argue that this claim must fail because a tortious interference with contract claim, under Minnesota law, requires that a contract exist. Gordon also argues that the tortious interference claim against him must fail because (1) a party's breach of its own contract is not actionable as a tort of interference, and (2) Graham Webb has not shown that his interference was improper.

A cause of action for tortious interference with contract requires establishment of the following five essential elements: (1) a contract exists; (2) the defendant knew of the contract; (3) the defendant intentionally procured the breach of that contract; (4) the defendant lacked justification for its actions; and (5) the plaintiff was damaged as a result. See Kallok v. Medtronic, Inc., 573 N.W.2d 356, 362 (Minn. 1998); Furlev Sales & Assoc., Inc. v. N. Am. Auto. Warehouse, Inc., 325 N.W.2d 20, 25 (Minn. 1982). A claim for tortious interference with contractual relations requires that a breach of the contract actually occur as a result of the tortfeasor's interference. See Furlev Sales, 325 N.W.2d at 25; Bouten v. Richard Miller Homes, Inc., 321 N.W.2d 895, 900 (Minn. 1982); Singleton v. Christ Servant Evangelical Lutheran Church, 541 N.W.2d 606, 614 (Minn. Ct. App. 1996); St. Jude Med., Inc. v. Medtronic, Inc., 536 N.W.2d 24, 30 n.6 (Minn. Ct. App. 1995). Defendants' argument prevails only if the Court were to conclude that, as a matter of law, no valid contracts were entered into on November 17, 1999, between Graham Webb and Gordon, and Graham Webb and the other selling owners of Bumble and

Bumble. Because the Court has determined that there was no insuperable bar to relief with respect to Graham Webb's breach of contract claim, Defendants can no longer rely on the nonexistence of a contract as the basis for dismissing this claim.

As for Gordon's argument that Graham Webb "must also show that this interference was improper," the Court finds this argument to be premature. (Bumble and Bumble and Gordon's Supp. Mem. at 8.) It is true that tortious interference claims require that the interference be improper. Graham Webb, however, does not, at this stage, have the burden of "showing" that the interference was improper; Graham Webb need only allege improper interference.

Gordon's second contention, that a party's breach of its own contract is not actionable as a tort of interference, misstates Graham Webb's allegations. Gordon correctly asserts that, under Minnesota law, a breach by the defendant of his own contract with the plaintiff is not actionable. See Bouten, 321 N.W.2d at 901; Hough Transit, Ltd. v. Nat'l Farmers Org., 472 N.W.2d 358, 361 (Minn. Ct. App. 1991). Graham Webb alleges in its Amended Complaint, however, that Gordon tortiously interfered with Graham Webb's contracts with the other selling owners of Bumble and Bumble. The contracts at issue in this claim did not involve Gordon. Accordingly, Gordon has failed to

prove that there is some insuperable bar to Graham Webb's claims of tortious interference with contract.[18]

### D. Breach of Covenant of Good Faith and Fair Dealing (Count XI)

Graham Webb also contends that Gordon breached his implied obligation of good faith and fair dealing. This claim fails because Minnesota law does not recognize an independent action for breach of the implied covenant where that action arises from the same conduct that underlies a breach of contract claim. Sports & Travel Marketing, Inc. v. Chicago Cutlery Co., 811 F. Supp. 1372, 1383 (D. Minn. 1993) (Doty, J.) (citing Wild v. Rarig, 234 N.W.2d 775, 790 (Minn. 1975) (holding that no independent tort action exists for bad faith breach of contract)); see also Space Center, Inc. v. 451 Corp., 298 N.W.2d 443, 452 (Minn. 1980) ("A malicious or bad faith motive in breaching a contract action does not convert a contract action into a tort action."); Kramer v. Bruns, 396 N.W.2d 627, 631 (Minn. Ct. App. 1986) ("bad faith termination of a contract is not an independent tort"). The Amended Complaint states that Gordon breached the implied covenant "by taking the above action." (Am. Compl. ¶ 82.) The "above action" includes the facts underlying the breach of contract claim against Gordon. Accordingly, because

---

[18] Gordon asserts the same two arguments for dismissing Graham Webb's claim against him for tortious interference with prospective advantage. For the same reasons as stated above, the Court concludes that there is no insuperable bar to relief against Gordon with regards to Graham Webb's tortious interference with prospective advantage claim.

Graham Webb's claim for breach of the covenant of good faith and fair dealing is based on the same set of facts as its claim for breach of contract, this claim will be dismissed.

**E. Interference with Prospective Economic Advantage (Count VI)**[19]

Graham Webb claims that Estée Lauder interfered with Graham Webb's prospective economic advantage with the other selling members of Bumble and Bumble. Minnesota courts have adopted the formulation set forth in section 766B of the Restatement (Second) of Torts in analyzing a claim for tortious interference with prospective economic advantage. United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632-33 (Minn. 1982). Section 766B provides that

> One who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relations, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

Restatement (Second) of Torts § 766B (1977).

Graham Webb alleges that Estée Lauder interfered with its contracts with the selling owners of Bumble and Bumble by misappropriating Graham Webb's trade secrets and confidential information. (Am. Compl. ¶ 60.) Estée Lauder asserts that there is no

---

[19] This claim, as it relates to Gordon, is addressed above in footnote 16.

claim of tortious interference with prospective economic advantage because Estée Lauder had a right to negotiate with Bumble and Bumble. Estée Lauder argues that it "did not misappropriate any confidential information or trade secret," and that its actions were not wrongful. (Estée Lauder Supp. Mem. at 24-5.) Estée Lauder relies on Sip-Top, Inc. v. Ecko Group, Inc., 86 F.3d 827, 832 (8th Cir. 1996), for its argument that Graham Webb's claim must fail because it has not proved, and that the evidence did not support, a claim of tortious interference with prospective economic advantage. (Estée Lauder Supp. Mem. at 24-5.) In Sip-Top, the Eighth Circuit affirmed the district court's holding that the plaintiff failed to present evidence that defendant acted wrongfully as required to support a claim of interference with prospective economic advantage. Sip-Top, 86 F.3d at 832. The Sip-Top court, however, was ruling on a motion for judgment as a matter of law, not on a motion to dismiss, as in the instant case. Accordingly, the Court finds Estée Lauder's arguments relating to Graham Webb's ability to prove certain facts to be wholly inappropriate at this stage, and will deny its motion as it relates to this claim.

**F. Promissory Estoppel (Count X)**

Graham Webb argues that promissory estoppel should be applied to Gordon's "clear and definite promises to Graham Webb." (Am. Compl. 78-9.) Gordon argues that this promissory estoppel claim "flies in the face of [Graham Webb's] July 30, 1999, agreement. . . . Like the other claims, this is barred by [Graham Webb's] agreement that

it 'shall not have any claims whatsoever against' Gordon . . . ." (Bumble and Bumble and Gordon Supp. Mem. at 9 (citing Jaffe Aff. Ex. B).) The next line from the July 30th agreement, however, is "other than those [claims] against the parties to a definitive agreement with you in accordance with the terms thereof . . . ." (Jaffe Aff. Ex. B.) Accordingly, the July 30th agreement does not present an insuperable bar to relief based on the waiver by Graham Webb, as Graham Webb has alleged a definitive agreement with Gordon.

Gordon also argues that the promissory estoppel claim lacks a "clear and definite" promise, based on the argument that the November 17, 1999, promise was only an agreement to agree. Under Minnesota law, to prevail on a claim for promissory estoppel, Graham Webb must establish four elements: (1) a promise had been made to it; (2) Gordon should have reasonably expected to induce action or forbearance by Graham Webb; (3) the promise actually induced such action or forbearance; and (4) the promise must be enforced to avoid injustice. See Martens v. Minn. Min. & Mfg. Co., 616 N.W.2d 732, 746 (Minn. 2000). Because Graham Webb has pleaded these elements in its Amended Complaint, and has alleged more than an agreement to agree between itself and Gordon–at a minimum, Graham Webb alleged that Gordon agreed to sell his stock and to continue working at Bumble and Bumble post-acquisition–the Court concludes that Gordon has not presented an insuperable bar to relief with respect to this claim.

### G. Breach of Duty of Confidentiality (Count VII)

Graham Webb claims that Estée Lauder had a duty of confidentiality with respect to the information contained in the PPM. Estée Lauder asserts, however, that such a duty cannot be created unilaterally by Graham Webb's sending the PPM to it. (Estée Lauder's Reply at 7.) According to Graham Webb, before it sent the PPM to Estée Lauder, a representative from DLJ spoke with an executive at Estée Lauder to determine whether Estée Lauder would be interested in receiving the PPM. (Am. Compl. ¶ 26.) Only after the DLJ representative informed the Estée Lauder executive that the PPM was confidential, and the executive requested to receive the PPM, did Graham Webb send the PPM to Estée Lauder. Therefore, Estée Lauder's assertion that the PPM was unilaterally thrust upon it is somewhat disingenuous. Moreover, whether a confidential relationship was created when Graham Webb sent the PPM to Estée Lauder, who knew that it contained confidential information, is a question of fact, and is not properly resolved in a motion to dismiss for failure to state a claim.

### H. Misappropriation of Trade Secret (Count VIII)

Graham Webb contends that Estée Lauder misappropriated the trade secret contained in the PPM. The trade secret consisted of the following information: (1) Bumble and Bumble was up for sale, (2) Graham Webb had entered into a contract to acquire a controlling interest in Bumble and Bumble, and (3) the details of the contract.

Estée Lauder responds that the PPM did not contain a trade secret and there was no confidential relationship or contractual relationship between Graham Webb and Estée Lauder. (Estée Lauder Supp. Mem. at 19-20.)

As addressed above, the question of whether Graham Webb's sending of the PPM to Estée Lauder created a duty of confidence on Estée Lauder's part is a question of fact, which is not before the Court.

With respect to Estée Lauder's assertion that the PPM did not contain a trade secret, the Court looks to Minnesota's Uniform Trade Secrets Act, Minn. Stat. sections 325C.01 to 325C.08 (1998), which defines a "trade secret" as:

> information, including a formula, pattern, compilation, program, device, method, techniques, or process, that:
>
> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn. Stat. § 325C.01, subd. 5. Graham Webb alleges that the information contained in the PPM, i.e., the details of Graham Webb's acquisition of Bumble and Bumble, was not generally known, and was disclosed to Estée Lauder with the "reasonable expectation and understanding" that the information would be treated as confidential. (Am. Compl. ¶ 64.) Accordingly, whether the PPM contained a trade secret depends on whether the

alleged trade secret "derived independent economic value . . . from not being generally known," and was "the subject of efforts that are reasonable . . . to maintain its secrecy." Minn. Stat. § 325C.01, subd. 5. Graham Webb establishes these requirements by alleging that the trade secret in the PPM was confidential information that gave it "an advantage over its competitors who did not know of it," (Am. Compl. ¶ 63), and, that the information was disclosed to Estée Lauder with the expectation that it would be kept confidential. Viewing the Amended Complaint in the light most favorable to Graham Webb, the Court finds that Graham Webb has stated a claim upon which relief can be granted.

**I. Unfair Competition (Count IX)**

Graham Webb claims that Estée Lauder improperly used the information in the PPM for its own advantage and that this constituted unfair competition. Estée Lauder responds that the tort of unfair competition is not an actionable tort in Minnesota, and, even if it were, it is duplicative of Graham Webb's tortious interference with contract and misappropriation of trade secret claims.

This Court has previously held that Minnesota recognizes unfair competition as an independent cause of action. See Radisson Hotels Int'l, Inc. v. Westin Hotel Co., 931 F. Supp. 638, 643-44 & n.6 (D. Minn. 1996) (Kyle, J.) ("Defendant's claim that Minnesota law does not recognize a cause of action for unfair competition is clearly wrong.") (citing Dalco Corp. v. Dixon, 338 N.W.2d 437, 441 (Minn. 1983); Rehab. Specialists, Inc. v.

Koering, 404 N.W.2d 301, 305 (Minn. Ct. App. 1987); Crown Holding Corp. v. Larson, 410 N.W.2d 373 (Minn. Ct. App. 1987)). But cf. Northwest Airlines v. Am. Airlines, 853 F. Supp. 1110, 1113 n.4 (D. Minn. 1994) (Murphy, C.J.) ("Under Minnesota law, unfair competition is not a unique tort with specific elements, but rather a 'general category of torts' recognized for the protection of commercial interests.") (citations omitted). The Koering court held that, although unfair competition is not an independent tort, it encompasses several causes of action "that have been recognized in order to protect commercial interests." Koering, 404 N.W.2d at 305.

Under Minnesota law, an unfair competition claim may be based on either: (1) tortious interference with contract; or (2) misappropriation of a trade secret. Id. at 305-06 (citations omitted). This Court, however, in interpreting Minnesota law, has previously dismissed unfair competition claims that are duplicative of other counts in the plaintiff's complaint. See Zimmerman Group, Inc. v. Fairmont Foods, Inc., 882 F. Supp. 892, 895 (D. Minn. 1994) (Davis, J.) (dismissing unfair competition claim as duplicative of a claim for tortious interference with contract); Northwest Airlines, 853 F. Supp. at 1113 n.4 (dismissing unfair competition claim as duplicative of claims for tortious interference with contract and misappropriation of trade secrets). Graham Webb has asserted both a tortious interference with contract claim and misappropriation of trade secret claim in its Amended Complaint. Nowhere in its Amended Complaint does Graham Webb identify

"wrongful conduct" that is distinct from its claims for tortious interference with contract or misappropriation of trade secret that would entitle it additional relief for unfair competition. The Court finds that Graham Webb's allegations underlying its claim for unfair competition fall entirely within the scope of its other common-law tort claims. Accordingly, the Court will dismiss this claim.

**J. Acting in Concert (Count V)**

Graham Webb asserts that Estée Lauder acted in concert with Gordon when he breached his contract with Graham Webb. Minnesota does not recognize an independent cause of action for acting in concert (otherwise known as civil conspiracy). See Gaming Corp. of Am. v. Dorsey & Whitney, 88 F.3d 536 (8th Cir. 1996) (finding that under Minnesota law, a civil conspiracy claim is merely means for asserting vicarious or joint and several liability, and not an independent cause of action); see also Harding v. Ohio Cas. Ins. Co., 230 Minn. 327, 338-39, 41 N.W.2d 818, 825 (1950) ("[a]ccurately speaking, there is no such thing as a civil action for conspiracy"). Moreover, Graham Webb's acting in concert claim is duplicative of its other claims. Graham Webb alleges that Estée Lauder (1) acted in concert with Gordon's breach of his contract with Graham Webb, which also forms the basis for its tortious interference with contract claim against Estée Lauder (Count III), and (2) acted in concert with Gordon's interference with Graham Webb's contracts with the other selling owners of Bumble and Bumble, which

forms the basis for its tortious interference with contract claims against both Gordon and Estée Lauder (Count IV). Accordingly, this claim will be dismissed as it is not an actionable tort in Minnesota and is duplicative of Graham Webb's other claims.

## Conclusion[20]

For the foregoing reasons, and based upon all of the files, records and proceedings herein, **IT IS ORDERED** that the Defendants' Motions to Dismiss (Doc. Nos. 14 and 16) are:

(I) **GRANTED** with respect to the claims of acting in concert (Count V), unfair competition (Count IX), and breach of the covenant of good faith and fair dealing (Count XI);

(II) **DENIED** with respect to the claims of breach of November 17 contract (Count I), breach of confidentiality agreements (Count II), interference with contracts (Counts III and IV), interference with prospective economic advantage (Count VI), misappropriation of trade secrets (Count VII), breach of duty of confidentiality (Count VIII), and promissory estoppel (Count X); and

(III) Counts V, IX and XI of the Amended Complaint are **DISMISSED WITH PREJUDICE.**

June 11, 2001

RICHARD H. KYLE
United States District Judge

[20] Based on the documents that were submitted to the Court, but not considered for purposes of these motions, the undersigned has serious reservations as to Graham Webb's ability to prove that "final definitive agreements" were entered into on November 17, 1999, between itself and the Bumble and Bumble owners.